Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/12/2023 09:06 AM CDT

Mark and Michelle Callahan, husband and wife,
appellants, v. Jeb Brant, an individual,
and Shelter Mutual Insurance
Company, a Missouri insurance
company, appellees.

___ N.W.2d ___

Filed May 12, 2023.     No. S-21-1006.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm
   a lower court's grant of summary judgment if the pleadings and admit-
   ted evidence show that there is no genuine issue as to any material facts
   or as to the ultimate inferences that may be drawn from the facts and
   that the moving party is entitled to judgment as a matter of law.
2. **Statutes: Appeal and Error.** Statutory interpretation presents a ques-
   tion of law, which an appellate court reviews independently of the
   lower court.
3. **Insurance: Agents.** When an insured asks an insurance agent to procure
   insurance, it is the duty of the insured to advise the insurance agent as
   to the desired insurance, including the limits of the policy to be issued.
4. ____: ____. An insurance agent has no duty to anticipate what coverage
   an insured should have.
5. ____: ____. It would be an unreasonable burden to impose upon
   insurance agents the duty to anticipate what coverage an individual
   should have, absent the insured's requesting coverage in at least a gen-
   eral way.
6. **Insurance: Valuation.** Nebraska's valued policy statute, Neb. Rev. Stat.
   § 44-501.02 (Reissue 2021), conclusively fixes the true value of insured
   property at the valuation written in the policy, and when there is a total
   loss, that sum is the measure of recovery.
7. ____: ____. Nebraska's valued policy statute, Neb. Rev. Stat. § 44-501.02
   (Reissue 2021), is required to be part of every fire policy issued
   in Nebraska.

8. **Insurance: Valuation: Damages.** Nebraska's valued policy statute, Neb. Rev. Stat. § 44-501.02 (Reissue 2021), fixes conclusively the worth of the building which is the subject of insurance, and if the building is wholly destroyed, its actual value is not to be determined by evidence, agreement, or arbitration. The damages are liquidated, and the measure of recovery already obtained.

9. **Insurance: Valuation: Public Policy.** The public policy objectives of Nebraska's valued policy statute, Neb. Rev. Stat. § 44-501.02 (Reissue 2021), are twofold. Before a loss, the purpose is to prevent overinsurance by requiring the parties to investigate and agree upon a binding determination of value before a policy is issued. And after a total loss, the purpose is to foreclose disputes and litigation between insurers and insureds over the value of the destroyed property by conclusively fixing its true value as a matter of law and by precluding evidence of a different value except to show fraud or a motive for arson.

10. **Statutes: Legislature: Intent.** When construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.

11. **Statutes: Courts.** A court must reconcile different provisions of a statute so that they are consistent, harmonious, and sensible.

12. **Statutes: Intent.** In construing a statute, the court must look at the statutory objective to be accomplished, the problem to be remedied, or the purpose to be served, and then place on the statute a reasonable construction that best achieves the purpose of the statute, rather than a construction defeating the statutory purpose.

13. **Insurance: Valuation.** Neither party can evade Nebraska's valued policy statute, Neb. Rev. Stat. § 44-501.02 (Reissue 2021), by avoiding the duty to investigate the value of the property before agreeing to a binding determination of value.

14. ____: ____. In actions between the insurer and insured to determine the amounts owed by the insurer after a total loss to real property insured against loss by fire, tornado, windstorm, lightning, or explosion, both the insurer and the insured are bound by the conclusive determination of true value established by Neb. Rev. Stat. § 44-501.02 (Reissue 2021), and neither can contend the value of the total loss is something different than was written in the policy.

15. ____: ____. It is not the type of action, but, rather, the nature of the claim being asserted, that triggers application of Nebraska's valued policy statute. And the valued policy statute is implicated whenever a suit between the insurer and the insured seeks to determine the

amount owed by the insurer for a total loss to real property insured against loss by fire, tornado, windstorm, lightning, or explosion.

Appeal from the District Court for Adams County: Terri S. Harder, Judge. Affirmed.

Mark R. Richardson, Timothy R. Engler, and Sami D. Segelke, of Rembolt Ludtke, L.L.P., for appellants.

Roger G. Steele and Liana Steele, of Steele Law Office, for appellee Jeb Brant.

Isaiah J. Frohling and Susan K. Sapp, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellee Shelter Mutual Insurance Company.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Freudenberg, JJ., and Miller, District Judge.

Per Curiam.

## I. INTRODUCTION

Mark and Michelle Callahan filed this negligence action against their insurer and its agent,[1] seeking to recover damages after their home was destroyed in a fire. The district court granted summary judgment in favor of the insurer and its agent. Although our reasoning differs, we affirm the district court's judgment.

## II. FACTUAL BACKGROUND

In 2011, the Callahans purchased a Shelter Mutual Insurance Company (Shelter) homeowners insurance policy through a licensed insurance producer, Jeb Brant.[2] Brant is a "captive" Shelter agent and exclusively sells Shelter insurance. Before the policy was issued, Brant used a reconstruction cost calculator tool to estimate the cost of rebuilding the Callahans' home, using information obtained from the Callahans and

---

[1] See Neb. Rev. Stat. § 44-103(8), (9), and (10) (Reissue 2021).

[2] See Neb. Rev. Stat. §§ 44-4047 to 44-4069 (Reissue 2021).

from the Clay County assessor's website. Brant prepared a report that estimated reconstruction costs at $250,481 and contained a disclaimer stating:

> Listed above is a summary of the information we used to estimate the cost of replacing your real property for the purpose of helping you decide the amount of coverage to obtain. The estimate is not a guarantee of adequate coverage. We provide this to you only to help you decide if your property is adequately insured. Please review this information to verify its accuracy. If any of the information is incorrect, please notify us.

The Callahans dispute that they received a copy of the report, but it is undisputed that they subsequently purchased a replacement cost policy insuring their home for $250,481.

The Callahans thereafter renewed their Shelter policy annually from 2012 to 2018. Pursuant to a provision in the policy, the coverage amount was automatically increased for inflation during this time. In 2018, the applicable policy limit on the home had increased to $260,600, and the policy premiums increased accordingly.

In anticipation of the policy's 2019 renewal, Michelle met with Brant to discuss the details of the policy. The parties dispute what was said during this meeting. The Callahans claim that Michelle expressed concern about whether the policy limit was sufficient to replace their home in the event of a total loss and that Brant assured Michelle they were "more than adequately covered." Brant denies making any such assurance. After this meeting, the Callahans renewed the Shelter policy for 2019 with a policy limit of $267,400 on their home.

After the Callahans renewed the policy, Mark and Brant happened to see each other. At this unscheduled meeting, the Callahans claim that Mark expressed concern to Brant regarding the sufficiency of the policy limit on their home. According to the Callahans, Brant assured Mark that the existing policy limit would be sufficient to rebuild the home

in the event of a total loss. Brant disputes making any such statement.

In May 2019, the parties agree the Callahans' home was totally destroyed by an electrical fire. The Callahans submitted a claim on the policy with Brant's assistance, and it is undisputed that Shelter subsequently paid the Callahans all amounts due and owing under the policy. The Callahans allege that when they subsequently obtained a quote for the cost of rebuilding their home, they learned "the cost to rebuild was substantially higher than the amount of insurance coverage." The quoted amount to rebuild the home is not reflected in our record, and the accuracy of the quote is disputed by the parties.

In April 2020, the Callahans filed a complaint against Shelter and Brant, styled as claims for breach of contract, negligence, and negligent misrepresentation. The Callahans later stipulated to the dismissal of their breach of contract claim. Their remaining claims generally allege that Brant negligently advised them on the estimated replacement value of their home and negligently misrepresented the adequacy of their policy limits in the event of a total loss. The Callahans contend they reasonably relied on Brant's statements and, as a result, sustained damages "in an amount to be proven at trial." And they alleged Shelter was liable for Brant's misrepresentations under a theory of respondeat superior. Brandt and Shelter denied the allegations of negligence and negligent misrepresentation, and alleged the Callahans' complaint failed to state a claim upon which relief could be granted.

Shelter and Brant each moved for summary judgment, arguing they were entitled to judgment as a matter of law on the Callahans' remaining claims. At the hearing on the motion, the court received multiple exhibits, including depositions of the parties and a copy of the applicable Shelter policy. As relevant to the issues on appeal, that policy contains a special endorsement stating:

### TO OUR CUSTOMERS—PLEASE NOTE

Please read this policy carefully. If you have questions, contact your Shelter agent for answers. No agent can know your exact coverage needs or budget considerations, so it is your responsibility to examine the policy and make sure it provides the types of coverage you need in the amounts you requested.

The declarations page of the policy states the Callahans' home was insured in the amount of $267,400, and the policy contains the following "Valued Policy" provision:

When this policy is written to insure any real property in this state against loss by fire, tornado, windstorm, lightning or explosion and the property insured shall be wholly destroyed, without criminal fault on the part of the insured or his assignee, the amount of insurance written on such real property shall be taken conclusively to be the true value of the property insured and the true amount of loss and measure of damages.

Shelter and Brant generally relied on the language of the policy, as well as on Nebraska case law regarding the duty of insureds and insurance agents, to argue that it was the Callahans' duty to know the value of the property they were insuring and to request the amount of insurance coverage they desired. Shelter and Brant argued that the policy limit on the home was unambiguously stated in the policy and represented the full measure of the Callahans' damages in the event of a total loss.

In opposing summary judgment, the Callahans conceded that they understood the nature and the amount of the coverage they had purchased from Shelter and that they never requested higher policy limits. But they argued that the amount of coverage they purchased was based on Brant's negligent advice as to the replacement value of their home and on his negligent misrepresentation that the policy limit they had purchased

would be sufficient to cover the cost of rebuilding their home in the event of a total loss.

In a written opinion, the district court granted summary judgment in favor of Shelter and Brant. The court understood the Callahans' remaining negligence claims to rest on a theory of negligent misrepresentation, and it correctly recited that for an insured to recover against an insurance agent for negligent misrepresentation under Nebraska law, the insured must show that the agent supplied false information upon which the insured reasonably relied and that the agent failed to exercise reasonable care or competence in communicating such information to the insured.[3]

The district court ultimately concluded the Callahans could not prevail on such a claim. It reasoned that even accepting as true the Callahans' claims that Brant provided false information regarding the replacement value of their property and the adequacy of their policy limit, the Callahans could not have reasonably relied on such information because, under the terms of the policy and under Nebraska law, it was the Callahans' duty and responsibility to know their coverage needs and to request the amount of coverage they wanted. The court also found the evidence was undisputed that the Callahans never asked Brant to provide them with a higher amount of coverage on their home or to procure any supplemental coverage.

Based on this reasoning, the district court granted summary judgment in favor of Shelter and Brant. The Callahans timely appealed, and we moved this appeal to our docket on our own motion.

## III. ASSIGNMENTS OF ERROR

The Callahans assign, consolidated and restated, that the district court erred in granting summary judgment because

---

[3] See, *Hobbs v. Midwest Ins., Inc.*, 253 Neb. 278, 570 N.W.2d 525 (1997); *Hansmeier v. Hansmeier*, 25 Neb. App. 742, 912 N.W.2d 268 (2018).

(1) there were genuine disputes of material fact regarding whether Brant supplied false information, whether the Callahans reasonably relied on such information, and whether Brant exercised reasonable care in advising them about the adequacy of their insurance coverage, and (2) the court failed to address whether Brant "had a duty to advise and obtain appropriate insurance coverage for the Callahans."

## IV. STANDARD OF REVIEW

[1] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[4]

[2] Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court.[5]

## V. ANALYSIS

[3-5] Before the district court, and again on appeal, the parties focus much of their argument on whether Brant owed the Callahans a legal duty to advise them on the value of their property and the sufficiency of the policy limit insuring their home. Nebraska law on this issue is well settled. When an insured asks an insurance agent to procure insurance, it is the duty of the insured to advise the insurance agent as to the desired insurance, including the limits of the policy to be issued.[6] An insurance agent has no duty to anticipate what

---

[4] *Kozal v. Snyder*, 312 Neb. 208, 978 N.W.2d 174 (2022).

[5] *Echo Group v. Tradesman Internat.*, 312 Neb. 729, 980 N.W.2d 869 (2022).

[6] See, *Merrick v. Fischer, Rounds & Assocs.*, 305 Neb. 230, 939 N.W.2d 795 (2020); *Dahlke v. John F. Zimmer Ins. Agency*, 245 Neb. 800, 515 N.W.2d 767 (1994); *Polski v. Powers*, 221 Neb. 361, 377 N.W.2d 106 (1985); *Manzer v. Pentico*, 209 Neb. 364, 307 N.W.2d 812 (1981).

coverage an insured should have.[7] Because of this, we have recognized it would be an unreasonable burden to impose upon insurance agents the duty to anticipate what coverage an individual should have, absent the insured's requesting coverage in at least a general way.[8]

Here, the Callahans concede they never asked Brant to procure coverage in a higher amount on their home. Instead, they contend that when they asked him if their existing policy limit was adequate, Brant "explicitly and impliedly undertook to advise the Callahans that the amount of coverage they had would be sufficient to rebuild their home in the event of a total loss."[9] The Callahans contend that these representations were false, that they reasonably relied upon them, and that they "suffered financial harm"[10] as a result. They specifically argue they "would have increased their policy limits if Brant would have advised them that they needed more coverage to replace their home in the event of a total loss."[11]

We have not directly addressed whether insureds can create a legal duty to provide correct advice about the value of insured property or the amount of insurance coverage needed merely by asking an insurance agent, "Is my current coverage adequate?" But it is not necessary, in this case, to answer that question. Because regardless of the duty issues, to prevail on the negligent misrepresentation claims they assert here, the Callahans must prove, among other things, that Brant supplied them with false information about the value of their insured property and that they reasonably relied on that information. In other words, they must establish that the true value of their home was actually higher than the amount for which

---

[7] See, *Merrick, supra* note 6; *Dahlke, supra* note 6; *Polski, supra* note 6.

[8] *Polski, supra* note 6.

[9] Brief for appellants at 8.

[10] *Id*. at 7.

[11] *Id.*

it was insured. And as we will explain, Nebraska's valued policy statute conclusively establishes the true value of the Callahans' loss in the event the property is wholly destroyed, and it precludes them from offering evidence that the true value was something other than the amount for which the home was insured.

### 1. Nebraska's Valued Policy Statute

Nebraska's valued policy statute is currently codified at Neb. Rev. Stat. § 44-501.02 (Reissue 2021), and it provides:

Whenever any policy of insurance is written to insure any real property in this state against loss by fire, tornado, windstorm, lightning, or explosion and the property insured is wholly destroyed without criminal fault on the part of the insured or his or her assignee, the amount of the insurance written in such policy shall be taken conclusively to be the true value of the property insured and the true amount of loss and measure of damages.

[6,7] We have long held that the valued policy statute conclusively fixes the true value of insured property at the valuation written in the policy, and when there is a total loss, that sum is the measure of recovery.[12] The valued policy statute is required to be part of every fire policy issued in this state,[13] and the statutory language was expressly incorporated into the Shelter policy issued to the Callahans.

[8] More than a century ago, we described the impact of the valued policy statute as "fix[ing] conclusively the worth

---

[12] See, e.g., *Leisy v. Farmers Mutual Home Ins. Co.*, 128 Neb. 278, 258 N.W. 481 (1935); *Fadanelli v. National Security Fire Ins. Co*., 113 Neb. 830, 205 N.W. 642 (1925); *Lancashire Ins. Co. v. Bush*, 60 Neb. 116, 82 N.W. 313 (1900); *Aetna Ins. Co. v. Simmons*, 49 Neb. 811, 69 N.W. 125 (1896).

[13] See Neb. Rev. Stat. § 44-501(10) (Reissue 2021) (requiring all fire policies to provide that total loss claims "shall be paid in accordance with section 44-501.02"). See, also, *Lancashire Ins. Co., supra* note 12.

of the building which is the subject of insurance" and when "the property is wholly destroyed, its actual value is not to be determined by evidence, agreement or arbitration. The damages are liquidated and the measure of recovery already ascertained."[14]

We discussed the public policy rationale behind the valued policy statute in *Heady v. Farmers Mut. Ins. Co.*[15] There, we stated:

"It is a well-known fact that it has been the practice of some fire insurance companies to insure property at any value the insured cared to put thereon without any investigation as to such value. The natural impulse of the insured was toward amply sufficient or even over valuation. The higher the valuation, the greater the premium. If there were no loss, the insurance company profited through the high valuation. If loss occurred, the insurer would contest the value or amount of recovery and the insured might recover less than the value stipulated in the policy, although he had honestly estimated the value at the time the insurance was taken and had paid premiums on the basis of such estimated value. This situation produced dissatisfaction and litigation. It was to correct this condition, that [the valued policy statute] was enacted. . . . Also, overvaluation was a temptation to commit arson, which might endanger lives or other property. The statute is not merely for the protection of the insured but 'rests on considerations of public policy, and it is probable that the insured could not, even by express contract, relinquish the benefit of its provisions.' . . .

"The method of the [valued policy statute] is to have the value liquidated in the policy by the parties to the

---

[14] *Lancashire Ins. Co., supra* note 12, 60 Neb. at 121, 82 N.W. at 313-14.

[15] *Heady v. Farmers Mut. Ins. Co.*, 217 Neb. 172, 349 N.W.2d 366 (1984).

contract and removed from dispute and determination 'by evidence, agreement or arbitration.' . . . The statute is confined to real property because values thereof are relatively fixed and certain. . . . The result of this method of making the policy valuation binding was to place on the insurer the duty to make its own investigation and binding determination of value before such is agreed upon and placed in the contract. . . . Neither party can evade the statute by avoiding this duty. If the insurer performs its full duty, in this respect, it is bound by its estimate of value based thereon unless conditions (reducing value), not ascertainable by a reasonably careful inspection and known to the insured, are withheld by the insured. But the insurer cannot close its eyes, make no reasonable investigation, take the bare word of the insured as to value and thereafter challenge such value. To permit this would be to nullify the good effect intended by the statute. It would reinstate the very situation and condition which the statute sought to destroy and prevent. It would encourage conscious overvaluation and, possibly, resulting arson."[16]

In *Heady*, the insurance agent issued a fire policy binder insuring property for $60,000. After a fire rendered the property a total loss, the insured sued to recover the $60,000 policy limit, and the insurer defended by alleging the insured had fraudulently misrepresented that the property had a value of $60,000 when he had recently purchased the property for just $5,000. We held that the valued policy statute conclusively established the true value of the property at the amount for which it was insured and necessarily precluded the insurer from offering evidence of a different value to establish its claim that the insured had misrepresented the property's

---

[16] *Id.* at 178-80, 349 N.W.2d at 370 (emphasis supplied), quoting *United States Fire Ins. Co. v. Sullivan*, 25 F.2d 40 (8th Cir. 1928).

value when procuring the coverage. *Heady* expressly held that "the valued policy statute precludes [the insurer] from asserting as a defense to liability on its fire insurance contract the fact that its insured either affirmatively misrepresented or failed to disclose the actual value of the subject property."[17] *Heady* did, however, allow the insurer to offer evidence of a lower value for the limited purpose of showing the insured had a motive to commit arson, because such use was consistent with the valued policy statute.

[9] *Heady* teaches that the objectives of the valued policy statute are twofold. Before a loss, the purpose is to prevent overinsurance by requiring the parties to investigate and agree upon a binding determination of value before a policy is issued. And after a total loss, the purpose is to foreclose disputes and litigation between insurers and insureds over the value of the destroyed property by conclusively fixing its true value as a matter of law and by precluding evidence of a different value except to show fraud or a motive for arson.[18]

Nebraska's valued policy statute is supported by related statutes that both prohibit and penalize overinsuring property. Neb. Rev. Stat. § 44-601 (Reissue 2021) prohibits insurers from knowingly issuing fire insurance for more than the fair value of a property. And Neb. Rev. Stat. § 44-602 (Reissue 2021) imposes a similar prohibition on property owners, making it unlawful to procure a fire policy for an amount that exceeds the fair value of the property. Moreover, Neb. Rev. Stat. § 44-603 (Reissue 2021) provides that insurers who

---

[17] *Id.* at 180, 349 N.W.2d at 370.

[18] See *Heady, supra* note 15. Accord *Springfield Fire and Marine Ins. Co. v. Boswell*, 167 So. 2d 780, 784 (Fla. App. 1964) ("[u]ndoubtedly an important object of the [valued policy] statute is also to simplify and facilitate prompt settlement of insurance claims when a total loss occurs. It serves to remove what would otherwise be a very troublesome and difficult issue to resolve either between the parties by negotiation or by the courts in litigation").

issue fire policies, and insureds who procure fire policies, are "presumed to know the insurable value of such building." This statute also establishes penalties for "[a]ny agent who knowingly effects insurance on a building . . . in excess of the insurable value thereof . . . ."[19]

After oral argument in this case, we requested supplemental briefing from the parties addressing, among other things, whether Nebraska's valued policy statute applies to the circumstances presented here. All parties submitted supplemental briefs, and we have carefully considered them.

Brant argues that the valued policy statute applies to the Callahans' action against Shelter and Brant, reasoning generally that after a total loss, both the statute and the terms of Shelter's policy conclusively fix the policy limit as the true value of the loss and the proper measure of damages in an action on the loss. Brant also argues that, to the extent the Callahans' misrepresentation claim asserts they reasonably relied on Brant's representation of value because they did not know the real insurable value of their home, their position is contrary to the provisions of § 44-603, which create a presumption that the insurer, the procuring agent, and the insured all know the insurable value of an insured building at the time the policy goes into effect.

Similarly, Shelter argues the valued policy statute "unambiguously and conclusively establishes $267,400 as the value of [the Callahans'] loss"[20] and because the Callahans have been paid that sum, they have received their full measure of damages. Shelter contends the Callahans are using this negligent misrepresentation action to, in effect, obtain additional insurance coverage on their home without paying any associated premium and without having requested a higher policy limit.

---

[19] § 44-603.

[20] Supplemental brief for appellee Shelter at 12.

Shelter describes this as "contrary to the spirit of the underlying purpose of § 44-501.02."[21]

The Callahans contend the valued policy statute has no application here, and they advance two reasons why. First, they argue the valued policy statute was enacted to address the evils of overinsurance and their claim involves "the perils of being underinsured."[22] In other words, they contend the valued policy statute precludes an insurer from challenging that the real value of the property is less than the amount for which it was insured, but it does not preclude an insured from challenging that the real value was more than the amount for which it was insured. Second, they argue that although Nebraska has had a valued policy statute for more than a century, no Nebraska case has "found the language of . . . § 44-501.02 to have any effect on a claim of negligent misrepresentation."[23] We understand this to be an argument that the valued policy statute applies in breach of contract actions, but not in negligent misrepresentation actions.

[10-12] Before addressing these arguments, we set out the settled principles of statutory construction that guide our analysis of whether the valued policy statute applies to this case. When construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.[24] A court must reconcile different provisions of a statute so that they are consistent, harmonious, and sensible.[25] And in construing a statute, the court must look at the statutory objective to be accomplished, the problem to be remedied, or the purpose to be served,

---

[21] *Id.* at 15.

[22] Supplemental brief for appellants at 13.

[23] *Id*. at 11.

[24] *Ag Valley Co-op v. Servinsky Engr.*, 311 Neb. 665, 974 N.W.2d 324 (2022).

[25] *Id.*

and then place on the statute a reasonable construction that best achieves the purpose of the statute, rather than a construction defeating the statutory purpose.[26]

### (a) Duties Imposed by Valued Policy Statute Apply to Insurers and Insureds

[13] We said in *Heady* that "'[n]either party'"[27] could evade the valued policy statute by avoiding the duty to investigate the value of the property before agreeing to a binding determination of value. This mutual duty encourages both the insurer and the insured to conduct a thorough and independent investigation into the value of the property to be insured before agreeing on a binding amount of coverage to be written into the policy, because in the event of a total loss, that policy limit becomes the conclusive measure of damages.

The Callahans do not appear to dispute that in Nebraska, they too have a duty under the valued policy statute to investigate and know the value of their property, nor could they. While some state legislatures have adopted valued policy statutes that require only the insurer to investigate value before coverage is issued, Nebraska's statute has no such language. And for almost a century, courts have said that "[n]either party" can evade Nebraska's valued policy statute by avoiding the duty to investigate value.[28] Moreover, in connection with fire insurance policies, Nebraska law presumes that both insurers and insureds know the insurable value of the buildings they seek to insure,[29] and it imposes an affirmative duty on insureds to advise any procuring insurance agent as to the desired insurance, including the limits of the policy to

---

[26] *Id.*

[27] *Heady, supra* note 15, 217 Neb. at 179, 349 N.W.2d at 370.

[28] See *Sullivan, supra* note 16, 25 F.2d at 42; *Heady, supra* note 15.

[29] See § 44-603.

be issued.[30] The preloss duties related to Nebraska's valued policy statute apply to both insurers and insureds.

### (b) Conclusive Determination of True Value Applies to Insurers and Insureds

We understand the Callahans to argue that the conclusive determination of coverage under § 44-501.02 applies only to insurers, and not to insureds. We see no such limitation in the plain language of the statute.

In *Heady*, we held that after a total loss, the valued policy statute precludes the insurer from challenging the conclusive determination of value by asserting, or by offering evidence, that "its insured either affirmatively misrepresented or failed to disclose the actual value of the subject property."[31] So, to the extent the Callahans argue that we have not previously applied the valued policy statute to preclude a claim of misrepresentation in connection with procuring the policy, both *Heady* and an earlier case[32] demonstrate that we have. But the Callahans are correct that, until now, we have not considered a case where the claim of misrepresentation was directed at the insurer rather than the insured. We are not persuaded it makes a difference under the valued policy statute.

Neither the language of the valued policy statute, nor the public policy objectives underpinning that statute, provide a principled basis to restrict application of the conclusive determination of true value only to circumstances when an insurer seeks to pay less than the policy limits because of a misrepresentation, and not to circumstances when an insured seeks to recover more than the policy limits because of a

---

[30] See, *Merrick, supra* note 6; *Dahlke, supra* note 6; *Polski, supra* note 6.

[31] *Heady, supra* note 15, 217 Neb. at 180, 349 N.W.2d at 370. Accord *Malm v. State Farmers Ins. Co.*, 125 Neb. 594, 251 N.W. 260 (1933) (after total loss, insurer could not avoid paying policy limits by claiming insured falsely misrepresented actual value of insured building).

[32] See *Malm, supra* note 31.

misrepresentation. Under either scenario, after a total loss, the valued policy statute conclusively fixes the true value of the insured property at the amount stated in the policy. It does so to protect the interest of both parties in the binding determination of value established in the policy and to liquidate damages in the event of a total loss and remove that issue from dispute and litigation.[33]

[14] Consequently, in actions between the insurer and insured to determine amounts owed by the insurer after a total loss to real property insured against loss by fire, tornado, windstorm, lightning, or explosion, we hold that both the insurer and the insured are bound by the conclusive determination of true value established by § 44-501.02, and neither can contend the value of the total loss is something different than what was written in the policy.[34] This binding determination necessarily precludes not only claims that the value of the destroyed property was lower than the amount stated in the policy, but also claims that it was higher. We find no merit in the Callahans' contention that the valued policy statute applies to preclude evidence that the destroyed property was overinsured, but not that it was underinsured.

(c) Valued Policy Statute Applies Here

This leaves only the Callahans' argument that the valued policy statute does not apply because of the nature of their action. The Callahans describe the nature of their action as a common law "action for negligent misrepresentation against their insurer,"[35] and they suggest the valued policy statute only applies to actions claiming a breach of the insurance policy.

We pause to note that even our dissenting colleagues appear to agree that if the Callahans had not dismissed their

---

[33] See *Heady, supra* note 15.

[34] See *Boswell, supra* note 18, 167 So. 2d at 784 (pursuant to valued policy statute "neither [insurer nor insured] can contend the value of the destroyed property is any different from what they had previously specified").

[35] Supplemental brief for appellants at 16.

breach of contract claim against Shelter and Brant, the valued policy statute would apply to preclude them from asserting that the true value of their home was something other than the amount for which it was insured. But we also note the Callahans' breach of contract claim sought precisely the same relief as their negligent misrepresentation claims—money damages for the cost of rebuilding their home after the total loss. And as we will explain, we are not persuaded that the applicability of the valued policy statute can be reliably determined by looking only at the nature of the action.

A suit on the policy after a total loss can take many forms— a declaratory judgment action, a breach of contract action, an action for specific performance, a suit in equity to reform the policy, a suit alleging the intentional tort of insurer bad faith, or any combination of such actions, just to list a few. And neither the plain language of the valued policy statute, nor any of its public policy objectives, confines its application to a single type of legal action between the insurer and insured. Construing the valued policy statute in a way that restricts its application exclusively to breach of contract actions would require us to read language into the statute that is not there, would undermine the statutory objectives, and would not place on the statute a reasonable construction that best achieves its recognized purpose.

[15] We thus decline the Callahans' invitation to adopt a construction that restricts Nebraska's valued policy statute to only certain actions. It is not the type of action, but, rather, the nature of the claim being asserted, that triggers application of the valued policy statute. Simply put, the valued policy statute is implicated whenever a suit between the insurer and the insured seeks to determine the amount owed by the insurer for a total loss to real property insured "against loss by fire, tornado, windstorm, lightning, or explosion."[36]

---

[36] § 44-501.02.

The Callahans have brought such an action. They seek money damages from Shelter and its agent related to the total loss of their insured home, alleging they are entitled to more than the policy limits because the procuring agent negligently misrepresented that the limits they purchased would be adequate to cover the true value of their loss. But Nebraska's valued policy statute has already conclusively determined the true value of their loss as a matter of law, and it is the value stated in the policy.

As stated, one of the objectives of the valued policy statute is to liquidate the true value of insured property after a total loss, and to thereby remove that issue from dispute and litigation.[37] To achieve this purpose, neither the insurer nor the insured are permitted, after a total loss, to challenge that the true value of the property is something other than the amount stated in the policy. In this way, the valued policy statute works to encourage both the insurer and the insured to conduct a thorough and independent investigation into the value of the property to be insured, before agreeing on a binding amount of coverage to be written into the policy, because in the event of a total loss, that agreed upon amount becomes the conclusive measure of damages as a matter of law.

For the same reasons the valued policy statute precluded the insurer in *Heady* from offering evidence that the insured misrepresented the true value of the insured property, we conclude the statute precludes the Callahans from offering evidence that the insurer's agent misrepresented the true value of the insured property. We emphasize the limited nature of this holding. We are not suggesting that the valued policy statute will apply to preclude every claim of negligent misrepresentation by an insured against an insurer. But when the alleged misrepresentation pertains to the true value of the insured loss, the valued policy statute is plainly implicated.

---

[37] See *Heady, supra* note 15.

We hold that the valued policy statute applies to the Callahans' misrepresentation claim against Shelter and Brant, and it conclusively establishes that the true value of the Callahans' home is $267,400—the amount for which it was insured. Moreover, it precludes the Callahans from offering evidence that the true value of their home was something other than the amount for which it was insured. And without such evidence, the Callahans cannot prevail on their negligence or negligent misrepresentation claims.

The Callahans purchased and paid premiums on $267,400 worth of insurance coverage on their home; after experiencing a total loss, they were paid the full amount of coverage owed under the policy. They now attempt an end run around the valued policy statute by suing the insurer in tort to recover damages for the same loss by claiming the true value of their home was actually higher than the coverage they purchased. But the valued policy statute applies to such a claim, and it necessarily precludes the Callahans from claiming, and from offering evidence, that the true value of their loss is anything other than the amount stated in the insurance policy.

Because the failure of proof on this essential element of the Callahans' claims necessarily rendered all other facts immaterial,[38] we agree with the district court's conclusion that Shelter and Brant were entitled to summary judgment as a matter of law. And although the district court did not expressly rely on the valued policy statute in granting summary judgment, a proper result will not be reversed merely because it was reached for a different reason.[39]

---

[38] See *Roskop Dairy v. GEA Farm Tech.*, 292 Neb. 148, 871 N.W.2d 776 (2015) (failure of proof concerning essential element of case necessarily renders all other facts immaterial), *disapproved on other grounds, Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019).

[39] See *Childs v. Frakes*, 312 Neb. 925, 981 N.W.2d 598 (2022).

## VI. CONCLUSION

The Callahans' claims of negligent misrepresentation are necessarily premised on proof that their home had a higher value than the amount for which it was insured. But such claims fail as a matter of law, because in the event of a total loss, Nebraska's valued policy statute conclusively determines that the true value of the insured property is the amount written in the policy. The district court did not err in granting summary judgment in favor of Shelter and Brant, and the judgment is affirmed.

AFFIRMED.

PAPIK, J., not participating.

HEAVICAN, C.J., dissenting.

I respectfully dissent. I disagree with the majority that the valued policy statute[1] precludes the Callahans' tort claims. In my view, interpreting the valued policy statute to foreclose an injured insured from bringing claims that sound in tort leads to an absurd result. To the extent the valued policy statute applies to the Callahans' claims, it establishes that Brant owed a duty of reasonable care when he invited the Callahans to rely on his valuation in setting the policy's limit.

Ultimately, I would resolve this appeal by applying our precedent governing claims of an insurance producer's negligence and negligent misrepresentation, as the parties argued to the trial court and initially on appeal. On that basis, I would reverse the district court's grant of summary judgment and remand the matter for further proceedings.

## VALUED POLICY STATUTE

In my view, to determine the effect of the valued policy statute on the Callahans' claims, the inquiry is controlled by different canons of statutory interpretation than those relied upon by the majority. The fundamental objective of

---

[1] See Neb. Rev. Stat. § 44-501.02 (Reissue 2021).

statutory interpretation is to ascertain and carry out the Legislature's intent.[2] In construing a statute, the court must look at the statutory objective to be accomplished, the problem to be remedied, or the purpose to be served, and then place on the statute a reasonable construction which best achieves the purpose of the statute, rather than a construction defeating the statutory purpose.[3] Components of a series or collection of statutes pertaining to a certain subject matter are in pari materia and should be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions are consistent, harmonious, and sensible.[4]

When judicial interpretation of a statute has not evoked a legislative amendment, it is presumed that the Legislature has acquiesced in the court's interpretation.[5] The court's interpretation will stand absent specific statutory language which compels it.[6] It is not within the province of the courts to read a meaning into a statute that is not there.[7] The construction of a statute which restricts or removes a common-law right should not be adopted unless the plain words of the statute compel it.[8] It is impermissible to follow a literal reading that engenders absurd consequences where there is an alternative interpretation that reasonably effects the statute's purpose.[9]

---

[2] *In re William R. Zutavern Revocable Trust*, 309 Neb. 542, 961 N.W.2d 807 (2021).

[3] *Florence Lake Investments v. Berg*, 312 Neb. 183, 978 N.W.2d 308 (2022).

[4] *County of Webster v. Nebraska Tax Equal. & Rev. Comm.*, 296 Neb. 751, 896 N.W.2d 887 (2017).

[5] *Lenz v. Central Parking System of Neb.*, 288 Neb. 453, 848 N.W.2d 623 (2014).

[6] See *In re 2007 Appropriations of Niobrara River Waters*, 283 Neb. 629, 820 N.W.2d 44 (2012).

[7] *Hauptman, O'Brien v. Auto-Owners Ins. Co.*, 310 Neb. 147, 964 N.W.2d 264 (2021).

[8] *Id.*

[9] *Wisner v. Vandelay Investments*, 300 Neb. 825, 916 N.W.2d 698 (2018).

We have recognized that there is a "significant public interest in a well-regulated insurance industry."[10] Yet, the majority overlooks our precedent and the remedial purpose of the valued policy statute. In my view, the majority's construction reads meaning into the statute to free insurers from liability for harms they may have caused, which defeats the valued policy statute's purpose.

The valued policy statute was first enacted in Nebraska in 1889.[11] Other than expanding its applicability to losses due to windstorms and explosions, the Legislature has not amended its language.[12] As a result, our prior interpretations of the statute must stand.

The valued policy statute is a part of every *contract* for insurance of real property in this state,[13] and it is a controlling provision.[14] Early in its history, the statute expressly governed "[a]ll domestic insurance companies, and [every] insurance agent, solicitor, broker, surveyor or adjuster doing business in this state . . . ."[15] As a response to business practices of insurers, the statute precludes insurers from avoiding payment after an insured suffers a loss:

> It is a matter of common knowledge that corporations engaged in the business of insuring real estate, have been long accustomed to vexatiously and oppressively resisting payment of claims arising under their policies. The

[10] *CenTra, Inc. v. Chandler Ins. Co.*, 248 Neb. 844, 855, 540 N.W.2d 318, 328 (1995). See Neb. Rev. Stat. § 44-101 (Reissue 2021).

[11] See *German Ins. Co. v. Eddy*, 36 Neb. 461, 54 N.W. 856, 857 (1893).

[12] Compare 1913 Neb. Laws, ch. 154, § 74, p. 424, with § 44-501.02.

[13] *Lancashire Ins. Co. v. Bush*, 60 Neb. 116, 82 N.W. 313 (1900). See *Heady v. Farmers Mut. Ins. Co.*, 217 Neb. 172, 349 N.W.2d 366 (1984).

[14] *German Ins. Co. v. Eddy, supra* note 11. See Neb. Rev. Stat. § 44-501(10) (Reissue 2021). See, also, Comp. Stat. § 7766 et seq. (1922); Rev. Stat. ch. 31, art. III (1913); Comp. Stat. ch. 43, §§ 44 and 45 (1893).

[15] Comp. Stat. § 7771 (1922); Rev. Stat. § 3171 (1913). See *German Ins. Co. v. Eddy, supra* note 11. See, also, 1989 Neb. Laws, L.B. 92, § 120.

reports of this court bear abundant evidence to the fact that no other class of litigants has so persistently endeavored to escape liability from their contract obligations by interposing technical and unconscionable defenses to actions instituted against them.[16]

Under the statute, there is no bargain the insurer can make "by which, in the event of a total loss of the insured property, it could escape from its obligation to pay the full amount of the indemnity for which the policy was written."[17]

The valued policy statute acts as a liquidated damages contract provision, removing the insured's need to prove the actual value of the property after it is wholly destroyed.[18] The rationale for doing so is readily apparent: The evidence that an insured would need in order to claim the lost value on a policy is destroyed with the property.

For the purposes of the Callahans' insurance claim, the value of the Callahans' home was conclusively fixed by the policy, and the Callahans were entitled to be paid the amount of the policy's limit. Yet, although the value of the Callahans' loss is a conclusively fixed value by the statute, it does not preclude the Callahans from proving the value of the alleged harm Shelter and Brant caused.[19] The actual value of the Callahans' property when it was destroyed in May 2019 has no bearing on what a reasonable replacement cost value of their home was in December 2018.[20] The Callahans allege that had Brant

---

[16] *Lancashire Ins. Co. v. Bush, supra* note 13, 60 Neb. at 124, 82 N.W. at 315.

[17] *Id*. at 121, 82 N.W. at 314.

[18] See *id*.

[19] See Neb. Rev. Stat. §§ 44-358 (Reissue 2021) (providing misrepresentation or warranty by insured may void policy when insurer was deceived to its injury) and 44-501.02 (relieving insurer's liability when property is destroyed due to criminal fault of insured).

[20] See *Kearney Conv'n Center v. Anderson-Divan-Cottrell Ins.*, 220 Neb. 319, 370 N.W.2d 86 (1985).

exercised reasonable care, they would have known this value and obtained greater insurance coverage.

Fundamentally, the valued policy statute serves as a consumer protection law governing contracts for insurance.[21] The valued policy statute is remedial in character, and it should be construed beyond its plain language "in accord with the manifest spirit of the enactment,"[22] and in its application, the statute should be interpreted to include cases "'within the same mischief.'"[23] We have long recognized that the reason for the adoption of the valued policy statute by the Legislature was clear. It "was designed to repress an evil practice, to advance public interests and promote justice."[24] That evil practice was the profiteering of insurers by the methods they used to carry on their business.

> These methods were not apparently actuated by good faith, and practices were followed which were characterized by deception and deceit, and which resulted in the companies participating therein in securing premiums on the basis of a valuation fixed by the company itself, continued as long as possible, but which was promptly repudiated in the event of total loss.[25]

To combat this form of profiteering, the valued policy statute placed a binding duty on the insurer to inspect and value the property before setting the policy limit.[26] If the property

---

[21] Compare §§ 44-501(10) and 44-501.02 with Neb. Rev. Stat. §§ 44-601 and 44-602 (Reissue 2021).

[22] *Calnon v. Fidelity-Phenix Fire Ins. Co.*, 114 Neb. 194, 201, 206 N.W. 765, 767 (1925).

[23] *Id*. at 198, 206 N.W. at 766 (quoting *Buckmaster v. McElroy*, 20 Neb. 557, 31 N.W. 76 (1887)).

[24] *Lancashire Ins. Co. v. Bush, supra* note 13, 60 Neb. at 124, 82 N.W. at 315.

[25] *Calnon v. Fidelity-Phenix Fire Ins. Co., supra* note 22, 114 Neb. at 199, 206 N.W. at 766.

[26] See, *id.*; *Fadanelli v. National Security Fire Ins. Co.*, 113 Neb. 830, 205 N.W. 642 (1925).

is wholly destroyed, the insurer is obligated to pay the full limit of the policy.[27] Any provision of a policy which limits the amount of the loss at less than the written sum in the policy is invalid under the valued policy statute and will not be enforced.[28] In this way, the valued policy statute protects the contract rights of insureds.

Under the statute, an insurer's risk "'can only come from the failure to observe care—that care which it might be supposed, without any prompting from the law, underwriters would observe, and which if observed would make their policies true contracts of assurance, not seemingly so, but really so.'"[29] It is only equitable that "after due inspection by the insurer, the amount which should be paid, in the event of total loss, is the amount stated in the policy."[30] It is only logical that insurers must exercise reasonable care in fulfillment of that duty.

In imposing a duty on insurers to value real property, the valued policy statute has made valuation a part of the insurance business and has implicitly mandated that insurers possess an expertise in real property valuation. When considering other forms of insurance, such as for personal property, inventory, or for business interruption, the insured is in a better position than the insurer to know the value at risk in the event of loss. The same cannot be said for insurance of real property, where the ordinary insured lacks the requisite knowledge to know the replacement cost value of the

---

[27] See *id.*

[28] *Fadanelli v. National Security Fire Ins. Co., supra* note 26.

[29] *Id.*, 113 Neb. at 835-36, 205 N.W. at 644 (quoting *Orient Insurance Company v. Daggs*, 172 U.S. 557, 19 S. Ct. 281, 43 L. Ed. 552 (1899)).

[30] *Calnon v. Fidelity-Phenix Fire Ins. Co., supra* note 22, 114 Neb. at 199, 206 N.W. at 766-67. See, also, *McGlone v. Midwestern Group*, 61 Ohio St. 3d 113, 573 N.E.2d 92 (1991); *Insurance Co. v. Barron*, 91 Miss. 722, 45 So. 875 (1908); *Insurance Company v. Leslie*, 47 Ohio St. 409, 24 N.E. 1072 (1890).

property. We have consistently held that homeowners are not competent to testify as to cost valuations of real property and that an expert is required to prove cost value.[31] Hence, in my view, the Callahans, who were incompetent in the cost valuation of their property, could turn to Brant's expertise in setting the homeowners policy's limit.

As the Callahans' claims show, arguably, "the evil practices are still present" in the insurance industry.[32] Legal commentators have noted that today, instead of profiteering through high premiums as a result of overvaluations, insurers of real property can profit through undervaluations.[33] Homeowners

---

[31] See, e.g., *Betty L. Green Living Trust v. Morrill Cty. Bd. of Equal.*, 299 Neb. 933, 911 N.W.2d 551 (2018); *American Central City v. Joint Antelope Valley Auth.*, 281 Neb. 742, 807 N.W.2d 170 (2011); *Brenner v. Banner Cty. Bd. of Equal.*, 276 Neb. 275, 753 N.W.2d 802 (2008); *Westgate Rec. Assn. v. Papio-Missouri River NRD*, 250 Neb. 10, 547 N.W.2d 484 (1996); *Airport Inn v. County Bd. of Equalization*, 215 Neb. 659, 340 N.W.2d 378 (1983); *First Baptist Church v. State*, 178 Neb. 831, 135 N.W.2d 756 (1965); *Graceland Park Cemetery Co. v. City of Omaha*, 173 Neb. 608, 114 N.W.2d 29 (1962).

[32] *Fadanelli v. National Security Fire Ins. Co., supra* note 26, 113 Neb. at 835, 205 N.W. at 644.

[33] See, generally, Kenneth S. Klein, *Minding the Protection Gap: Resolving Unintended, Pervasive, Profound Homeowner Underinsurance*, 25 Conn. Ins. L.J. 34 (2018); Peter Molk, *Playing with Fire? Testing Moral Hazard in Homeowners Insurance Valued Policies*, 2018 Utah L. Rev. 347 (2018); Kenneth S. Klein, *When Enough Is Not Enough: Correcting Market Inefficiencies in the Purchase and Sale of Residential Property Insurance*, 18 Va. J. Soc. Policy & L. 345 (2011); Peter Molk, *Is There Any Value? Reevaluating Homeowners Insurance Valued Policy Laws*, Yale Law School (2011), http://hdl.handle.net/20.500.13051/17819.

insurance policies are materially price elastic, and insureds base their buying decision primarily on premium price, arguably, driven in large part because of the vast number of captive customers.[34] Insurers' profits are no longer driven by high premiums resulting from overvaluation, but by the number of policies sold.[35] Through undervaluation, insurers can increase their market share, and because insureds rarely experience a total loss, the insureds are unaware of the risk they are assuming.[36] This practice is evidenced in Brant's bonus structure, which is primarily based on the number of policies he has sold, rather than the amount of premiums collected, and is precisely what the Callahans allege caused them harm.

By precluding the Callahans' claims, the majority forecloses all remedies, including torts, for harm caused by insurers of real property to their insureds, while those insurers continue to enjoy remedies if they are harmed by their insureds.[37] It appears no other court has interpreted the valued policy statute to preclude tort actions against insurers

---

[34] See, generally, *id.*

[35] See, generally, *id.*

[36] See, generally, *id.*

[37] See §§ 44-358 (providing misrepresentation or warranty by insured may void policy when insurer was deceived to its injury) and 44-501.02 (relieving insurer's liability when property is destroyed due to criminal fault of insured).

of real property when the insurers' actions have caused them harm.[38] Nor does it appear that any other court has

---

[38] See, e.g., *Nelson v. American Family Mut. Ins. Co.*, 262 F. Supp. 3d 835 (D. Minn. 2017) (recognizing Minnesota's valued policy statute controls damages in contract actions, but not for claim of negligent misrepresentation), *affirmed* 899 F.3d 475 (8th Cir. 2018); *White v. Allstate Ins. Co.*, 513 F. Supp. 2d 674 (E.D. La. 2007) (recognizing plaintiffs sufficiently pled claims for recovery under Louisiana's valued policy law, as well as theories of negligence and negligent misrepresentation); *Conestoga Chemical Corp. v. F. H. Simonton, Inc.*, 269 A.2d 237 (Del. 1970) (recognizing general rule that insurance producers are liable to insureds for amount which insured would have received had coverage been properly procured); *Mississippi Farm Bureau Mut. Ins. Co. v. Todd*, 492 So. 2d 919 (Miss. 1986) (holding insurer's bad faith warranted punitive damages); *Britton v. Farmers Ins. Group*, 221 Mont. 67, 721 P.2d 303 (1986) (recognizing harm under insurance policy separate from harm caused by insurer's breach of good faith); *Rumpza v. Donalar Enterprises, Inc.*, 581 N.W.2d 517 (S.D. 1998) (recognizing valued policy statute does not defeat claim of insurer's bad faith); *Free v. Republic Ins. Co.*, 8 Cal. App. 4th 1726, 11 Cal. Rptr. 2d 296 (1992) (stating once insurance producer elected to respond to insured's inquiries, special duty arose requiring producer to use reasonable care); *Daso v. Creston Ins. Center, LLC*, 2018 Ohio 5312, 118 N.E.3d 501 (Ohio App. 2018) (holding even if valued policy statute applies in negligence cases, it cannot be used to demonstrate negligence per se unless alleged harm was specific harm statute designed to prevent); *Munn v. Rudy Stapleton & Son*, No. F-02-030 2003 WL 22390109 (Ohio App. Oct. 17, 2003) (holding valued policy statute is not applicable in negligence action brought by insured).

interpreted a valued policy statute to protect insurers.[39] Yet, other courts have held that plaintiffs may recover both contract damages and tort damages because, as the Callahans allege here, separate wrongs result in separate harms.[40] Moreover, the majority's reading of the valued policy statute suggests that had the Callahans hired an independent

---

[39] See, e.g., *Hartford Live Stock Ins. Co. v. Gibson*, 256 Ky. 338, 76 S.W.2d 17 (1934) (holding valued policy statute is restrictive on insurer and protective of insured); *Horn v. Atlas Assurance Society*, 241 Ky. 226, 43 S.W.2d 675 (1931) (stating that presumably, insurance company knows what it is doing and fixes value by inspection); *Landry v. Louisiana Citizens Property Ins.*, 983 So. 2d 66 (La. 2008) (stating valued policy statute provides that insurer is not permitted to question value); *Nathan v. St. Paul Mutual Insurance Co.*, 243 Minn. 430, 68 N.W.2d 385 (1955) (holding purpose of valued policy statute includes valuation of property by insurer with reasonable accuracy); *Filiatreau v. Allstate Ins. Co.*, 178 W. Va. 268, 358 S.E.2d 829 (1987) (holding legislature contemplated that insured would receive windfall in certain cases and that threat of this windfall would correct insurance companies' behavior); *Farmers-Merchants Bank v. St. Katherine*, 693 So. 2d 876 (La. App. 1997) (holding valued policy law refuses to let insurers raise various defenses and should be interpreted liberally in favor of insured); *Community Title v. Safeco Ins. Co.*, 795 S.W.2d 453 (Mo. App. 1990) (holding valued policy statute does not apply to insureds).

[40] See, e.g., *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 102 P.3d 268, 22 Cal. Rptr. 352 (2004) (holding fraud and misrepresentation claims not barred when tortious conduct separate from breach of contract); *Williams Ford v. Hartford Courant Co.*, 232 Conn. 559, 657 A.2d 212 (1995) (remedy on contract is independent of remedy for negligent misrepresentation); *U.S. Bank, N.A. v. Integrity Land Title*, 929 N.E.2d 742 (Ind. 2010) (recognizing duty might lie in tort, as well as in contract); *Presnell Const. Managers v. EH Const.*, 134 S.W.3d 575 (Ky. 2004) (holding tort duties are independent of contractual duties); *Jacques v. First Nat'l Bank*, 307 Md. 527, 515 A.2d 756 (1986) (recognizing tort duty separate from contractual duty); *Romo v. Shirley*, 411 Mont. 111, 522 P.3d 401 (2022) (long recognizing breaches of separate duties support separate claims); *Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 271 N.W.2d 368 (1978) (holding tort of bad faith is not for breach of contract; it is separate tort).

licensed appraiser and relied on the appraiser's replacement cost valuation in setting their homeowners insurance policy limit, they would be precluded from bringing their tort claims against the appraiser in the event the property was wholly destroyed.

In my view, the plain language of the statute does not support construing the valued policy statute beyond its effect on insurance contracts. Nor does it support such a derogation of our common-law tort principles. I cannot read the plain language of the statute to preclude the Callahans' tort actions and would not prevent them from proving how a reasonable insurance producer would have responded to their concerns.

Because of the valued policy statute's remedial purpose, the statute should be read to "avoid the gross inequities which may occur when an honest but unwitting insured"[41] is harmed by the business practices of an insurer. In accordance with the manifest spirit of the statute, instead of precluding the Callahans from recovery, I would interpret their allegations to be within the same mischief that the valued policy statute was enacted to prevent: profiteering by insurers at the expense of their insureds. To read it otherwise allows "the evil intended to be remedied [to] still prevail, and without any good reason to support it."[42]

## TORT CLAIMS

As noted above, I would apply our existing precedent concerning claims of an insurance producer's negligence and negligent misrepresentation to resolve this appeal. We have stated that when a duty is imposed by or arises out of the circumstances surrounding or attending a transaction, the

---

[41] *Kent v. Insurance Co. of North America*, 189 Neb. 769, 775, 205 N.W.2d 532, 536 (1973).

[42] *Calnon v. Fidelity-Phenix Fire Ins. Co., supra* note 22, 114 Neb. at 201, 206 N.W. at 767 (quoting *Orient Ins. Co. v. Parlin & Orendorff Co.*, 14 Tex. Civ. App. 512, 38 S.W. 60 (1896)).

breach of the duty is a tort.[43] In such a case, the tortious act, and not a breach of the contract, is the gravamen of the action because the contract merely created the state of things that furnished the occasion for the tort.[44]

The Callahans do not dispute that Shelter paid the policy's limit in accordance with the terms of the policy and the valued policy statute. The Callahans do not allege Shelter and Brant breached a contractual obligation under the homeowners insurance policy. While the homeowners insurance policy is undoubtedly the result of the Callahans' interactions with Brant, the true legal dispute of the Callahans' claims only concern Brant's conduct surrounding and attending the transaction: specifically, Brant's gathering of information and calculation of a replacement cost value of the Callahans' home to serve as the policy's limit for 2019, as well as his alleged misrepresentation of the sufficiency of his valuation to the Callahans.

## Additional Background

Before turning to the Callahans' claims, it is necessary to review some additional background to the Callahans' suit. When the Callahans first obtained a Shelter homeowners policy in 2011, the policy's limit was determined by a cost valuation conducted by Brant. The policy was a replacement cost policy, meaning it was designed to cover the cost of replacing or rebuilding any lost property, in the same kind and quality as the property before the loss, up to the policy's limits. Following Shelter's procedures for its agents, Brant collected data about the Callahans' home from the county assessor's website and from the Callahans directly. Also consistent with Shelter's procedures, Brant visited the Callahans' home and took photographs of the home's exterior. Shelter's

---

[43] See *Zawaideh v. Nebraska Dept. of Health & Human Servs.*, 285 Neb. 48, 825 N.W.2d 204 (2013).

[44] See *id.*

procedure does not require agents to enter and inspect the interior of homes, and in accordance, Brant did not do so.

As required by Shelter, Brant inputted the collected data into Shelter's "Construction Cost Estimator." The estimator is a computer program that analyzes the inputted data, applies a formula, and calculates the estimated cost of rebuilding the home. The estimator's formula is updated quarterly with building materials and labor market prices. In February 2011, based on Brant's inputted data, the estimator calculated the Callahans' home's reconstruction cost, with debris removal, to be $250,481 as of November 2010. Per the estimator's calculation, the limit of the 2011 homeowners insurance policy offered to the Callahans was set at $250,481.

The homeowners insurance policy that the Callahans purchased in 2011 had a term of 1 year, but the policy automatically renewed annually upon the continued payment of premiums. Each year, the policy limit was subject to an adjustment according to an automated inflation guard. Brant testified that the inflation guard was based on inflation and generally resulted in approximately a 2-percent increase annually. Brant's testimony does not specify whether the inflation increases are based on increased market prices of building materials and labor or the rate of monetary inflation. After 2011, Brant never recalculated the replacement cost of the Callahans' home.

From 2011 through 2018, the Callahans renewed the homeowners insurance policy each year. During this period, Brant periodically met with the Callahans to conduct reviews of the policy. The record on appeal does not contain detailed accounts of these intermediary meetings. Still, the record indicates that the Callahans occasionally provided Brant with updated information about their home, such as when they remodeled the kitchen and finished the basement. Brant testified that updating a kitchen or remodeling a basement is not "a big enough change to make a difference" in the replacement cost of a home.

Brant testified that when he met with Michelle in anticipation of the policy's renewal for 2019, he was concerned that the Callahans would relinquish their policy with Shelter. The facts of the separate meetings Brant had with Michelle and Mark were disputed by the parties. But on summary judgment, the evidence must be viewed in the light most favorable to the Callahans. In that light, Michelle specifically asked Brant whether the Callahans had enough coverage to rebuild their home if it was wholly destroyed, and Brant expressly assured her that the policy's limit was sufficient. Additionally, in that light, Mark told Brant that the Callahans' primary consideration was the amount of coverage provided in the event of a total loss and not the price of the premiums that the Callahans would have to pay. Brant again expressly assured Mark that the home was sufficiently covered in the event it was wholly destroyed.

It is undisputed that neither Michelle nor Mark told Brant a specific dollar amount of requested coverage or what they believed to be the replacement cost value of their home.

### Negligence

The issue on appeal as to the Callahans' negligence claim is whether Shelter and Brant owed a legal duty to the Callahans to exercise reasonable care for Brant's role in setting the 2019 homeowners insurance policy limit. Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation.[45] On the contrary, what conduct the standard of care requires and whether a party deviated from the standard of care are questions of fact based on the particular circumstances presented by the evidence.[46] The scope of the duty in any negligence case is to

---

[45] *Porter v. Knife River, Inc.*, 310 Neb. 946, 970 N.W.2d 104 (2022).

[46] See *Cerny v. Cedar Bluffs Jr./Sr. Pub. Sch.*, 262 Neb. 66, 628 N.W.2d 697 (2001).

conform to the legal standard of reasonable conduct in light of the apparent risk.[47] A negligence cause of action, like all tort actions arising from a breach of duty imposed by law, protects a plaintiff's interest or right to be free from another's conduct that causes damage or loss to the plaintiff's person or property.[48]

We have long recognized that an insurance producer owes a duty of reasonable care to an insured in securing the insurance requested by the insured and in advising an insured.[49] On the other hand, an insurance producer does not have a duty to anticipate what coverage an individual should have absent the insured's requesting coverage "in at least a general way."[50] Nor does an insurance producer have an affirmative duty to voluntarily advise the insured.[51] Ultimately, the insured has a duty to advise the producer as to the desired insurance, including the limits of the policy to be issued.[52] Thus, our precedent recognizes that Brant owed a duty of reasonable care either if the Callahans' request for coverage in the amount of the replacement cost value of their home constituted a request "in at least a general way" or if Brant advised the Callahans regarding the policy's limit.

Our precedent instructs that an insured's request is sufficiently "in at least a general way" for the purpose of imposing a duty to procure insurance when the insured provides a point of reference, even when the insured does not request a specified amount or type of coverage.[53] I note that the Nebraska

---

[47] See *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014).

[48] See *Henriksen v. Gleason*, 263 Neb. 840, 643 N.W.2d 652 (2002).

[49] See *Merrick v. Fischer, Rounds & Assocs.*, 305 Neb. 230, 939 N.W.2d 795 (2020).

[50] *Polski v. Powers*, 221 Neb. 361, 364, 377 N.W.2d 106, 108 (1985).

[51] See *id*.

[52] See *Merrick v. Fischer, Rounds & Assocs., supra* note 49.

[53] See *Kenyon & Larsen v. Deyle*, 205 Neb. 209, 216, 286 N.W.2d 759, 764 (1980) (holding request for insurance to be "'changed over'" sufficient).

Court of Appeals has similarly concluded that an insurance producer's selection of a policy's limit when the insured did not provide a specific valuation or any other input to the producer constituted advising the insured.[54] In my view, the reasonings of these cases should resolve this appeal.

The record shows that Brant testified that as an insurance producer, he conducts his due diligence "to try and insure" his clients for what he "think[s] they need to be adequately insured for." Accordingly, when selling homeowners insurance, he completes "a Construction Cost Estimator, and that estimator will determine the value of what the going rate is on building a home." Brant stated that he updates the estimator when an addition is made or "some type of extensive remodel; otherwise, the policy has an inflation guard in it that's supposed to keep up with the rate of inflation."

The Callahans routinely provided Brant with updated information on their home to adjust the replacement cost calculation. Yet, Brant testified that updating a kitchen or remodeling a basement is not "a big enough change to make a difference" in the replacement cost of a home, unless "they added on to the basement" or "took out walls or went back with [a] bigger kitchen." Despite receiving updated information from the Callahans about their home, despite their request for coverage in an amount to rebuild their home in the event of a total loss, and despite knowing that the Callahans' primary concern was the amount of insurance coverage, Brant did not recalculate the replacement cost value of the Callahans' home and no change was made to the policy limit.

Although the Callahans never requested coverage in a specific amount and did not provide Brant with their own valuation of their home, they requested a policy limit defined by the fixed reference point of the replacement cost value of their home. The 2019 homeowners policy limit was

---

[54] See *Custom Auto Body Co. v. Prososki*, No. A-96-880, 1999 WL 14492 (Neb. App. Jan. 12, 1999) (not designated for permanent publication).

selected exclusively by Brant, based on his replacement cost valuation of their home initially calculated in 2011, which he then held out to be in the amount that the Callahans requested—the replacement cost value of their home. In my view, the Callahans' request was "in at least a general way," and Brant advised the Callahans as to their policy's limit.

Because the Callahans requested that Brant secure insurance coverage in an amount equal to the replacement cost value of their home, and Brant responded to that request with the policy's limit, I would conclude that Brant owed a duty of reasonable care to the Callahans in preparing and calculating the replacement cost valuation of their home and in selecting the policy's limit. Whether he failed to reasonably conduct himself in light of the risk to the Callahans is a question of fact, which, based on the circumstances presented by the evidence, must be determined by a fact finder.

There is no merit to Shelter and Brant's contention that the policy's plain language insulates Brant from a duty to exercise reasonable care in calculating the replacement cost value of the Callahans' home as a matter of law. Shelter and Brant's argument seems to suggest that Brant's conduct "merged" into the contract and that the policy somehow derogated any duties Brant owed to the Callahans in tort. As noted above, while the homeowners insurance policy is undoubtedly the result of the Callahans' interactions with Brant, the true legal dispute of the Callahans' negligence claim concerns only Brant's conduct surrounding and attending the transaction—gathering information and calculating a replacement cost valuation of the Callahans' home to serve as the policy's limit for 2019.

Shelter and Brant overlook that Brant's alleged negligence limited the ability of the Callahans to enter into a true contract of assurance. Brant held out that he was qualified to value the replacement cost of the Callahans' home, that the related policy limit was sufficient to cover the costs associated with rebuilding their home, and that they could rely on his

valuation.[55] While the homeowners insurance policy created the state of things that furnished the occasion, it was Brant's alleged tortious acts, and not a breach of the parties' contract, that is the gravamen of this action.

In my view, our precedent correctly holds that when an insured asks an insurance producer to procure insurance, it is the insured's duty to advise the producer as to the desired insurance, including the limits of the policy to be issued. Yet, I would conclude that in conducting their business, insurance producers are under a legal duty to conduct that business with reasonable care. When I view the evidence in the light most favorable to the Callahans, Brant owed a duty of reasonable care to the Callahans and the district court erred in granting summary judgment on this claim.

NEGLIGENT MISREPRESENTATION

The issue on appeal as to the Callahans' negligent misrepresentation claim is whether they could reasonably rely on Brant's assurances and representations that their homeowners insurance policy limit was sufficient to cover the cost of rebuilding their home in the event of a total loss. It is well established that an insurance producer may be held liable for a negligent misrepresentation made to an insured.[56] We have adopted the definition of the negligent misrepresentation cause of action contained in the Restatement (Second) of Torts:

> "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he

---

[55] See, *Kent v. Insurance Co. of North America, supra* note 41; *Fidelity Mutual Fire Ins. Co. v. Lowe*, 4 Neb. (Unoff.) 159, 93 N.W. 749 (1903).

[56] *Flamme v. Wolf Ins. Agency*, 239 Neb. 465, 476 N.W.2d 802 (1991).

fails to exercise reasonable care or competence in obtaining or communicating the information."[57]

In sum, negligent misrepresentation is the breach of the duty to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his or her economic affairs.[58] Liability for negligent misrepresentation is based upon the failure of the actor to exercise reasonable care or competence in supplying correct information.[59] The duty of care to be observed in supplying information for use in commercial transactions implies an undertaking to observe a relative standard, which may be defined only in terms of the use to which the information will be put, weighed against the magnitude and probability of loss that might attend that use if the information proves to be incorrect.[60] Whether a plaintiff reasonably relied on a representation is a question of fact based on the totality of the circumstances.[61]

Shelter and Brant concede that material facts remain disputed as to whether Brant's representations were false and whether he failed to exercise reasonable care. Yet, Shelter and Brant argue that they were entitled to judgment as a matter of law because the Callahans could not have justifiably relied on Brant's representations as a matter of law when the homeowners insurance policy clearly and unambiguously stated the policy's limit and when "Special Coverage Form 3" of the policy stated: "No agent can know your exact coverage needs or budget considerations, so it is your responsibility

---

[57] *Gibb v. Citicorp Mortgage, Inc.*, 246 Neb. 355, 370, 518 N.W.2d 910, 921 (1994) (quoting Restatement (Second) of Torts § 552 (1977)).

[58] *Jill B. & Travis B. v. State*, 297 Neb. 57, 899 N.W.2d 241 (2017); *Stonacek v. City of Lincoln*, 279 Neb. 869, 782 N.W.2d 900 (2010).

[59] *Gibb v. Citicorp Mortgage, Inc., supra* note 57.

[60] *Id.*

[61] See, *Dietzel Enters. v. J. A. Wever Constr.*, 312 Neb. 426, 979 N.W.2d 517 (2022); *Gibb v. Citicorp Mortgage, Inc., supra* note 57.

to examine the policy and make sure it provides the types of coverage you need in the amounts you requested."

In support of their argument, Shelter and Brant rely upon a proposition that this court has invoked only twice: "'An insured has no right to rely upon an agent's patently absurd interpretation of a policy. He ordinarily may rightfully rely, however, upon an agent's interpretation that is plausible and not in patent conflict with the printed policy although legally untenable. . . .'"[62] We found the proposition to be inapplicable in both cases.

In *Bayer v. Lutheran Mut. Life Ins. Co.*,[63] this court concluded that the proposition did not apply because the insurance producer's statements were promissory, rather than illustrative, and held that an insured can rightfully rely on promissory statements made by an insurance producer. Likewise, in *Flamme v. Wolf Ins. Agency*,[64] this court concluded that the proposition did not apply because, based on the facts of that case, it was unlikely that a reasonable reading of the policy would have disclosed the falsity of the producer's alleged misrepresentation. To the extent Shelter and Brant rely on *Dahlke v. John F. Zimmer Ins. Agency*,[65] that case is inapplicable to the Callahans' negligent misrepresentation claims, as the cause of action in *Dahlke* was negligence and the proposition was only referenced analogously.

I would conclude that the patent conflict proposition is inapplicable to the instant case. First, Brant's assurances were promissory as to the policy limit based on the replacement cost valuation he conducted, and not illustrative of the

---

[62] *Flamme v. Wolf Ins. Agency, supra* note 56, 239 Neb. at 472, 476 N.W.2d at 807 (quoting *Bayer v. Lutheran Mut. Life Ins. Co.*, 184 Neb. 826, 172 N.W.2d 400 (1969)).

[63] *Bayer v. Lutheran Mut. Life Ins. Co., supra* note 62.

[64] *Flamme v. Wolf Ins. Agency, supra* note 56.

[65] *Dahlke v. John F. Zimmer Ins. Agency*, 245 Neb. 800, 515 N.W.2d 767 (1994).

terms of the homeowners insurance policy. Even if they were somehow illustrative of the policy's limit, the case on which we relied in *Bayer* strenuously rejected the insurer's argument that an unambiguous contract provision would bar an insured's recovery.[66] Rightfully, an insured may ordinarily rely on a producer's interpretation, so long as that interpretation is not in *patent conflict* with the policy. A patent conflict is an irreconcilable conflict, differing essentially from the express language of the policy.[67] The presence of unambiguous language does not equate to the existence of a patent conflict such that an insured's reliance is unjustifiable as a matter of law.[68] Our case law demonstrates that an insured may ordinarily rely on a producer's interpretation *even if* that interpretation is legally untenable, so long as that interpretation is not obviously incompatible with the printed policy. The rule would be subsumed if any conflict with unambiguous language constituted a patent conflict.

Additionally, a reasonable reading of the policy was unlikely to have disclosed any falsity in Brant's representations that the policy limit amount was reasonably equal to the replacement cost value of their home. Viewing the evidence in the light most favorable to the Callahans, we find they informed Brant that their exact coverage need was the replacement cost value of their home and that their primary budget consideration was obtaining that amount of coverage, not the price of the premium. Considering that Brant allegedly knew this

---

[66] See *Mutual Ben. Life Ins. Co. v. Bailey*, 55 Del. 215, 190 A.2d 757 (1963).

[67] *Bayer v. Lutheran Mut. Life Ins. Co., supra* note 62. See, *Stivers v. National American Insurance Company*, 247 F.2d 921 (9th Cir. 1957); *Mutual Ben. Life Ins. Co. v. Bailey, supra* note 66. See, also, *Chase v. National Indemnity Co.*, 129 Cal. App. 2d 853, 278 P.2d 68 (1954); *Mayfield v. Fidelity & Casualty Co.*, 16 Cal. App. 2d 611, 61 P.2d 83 (1936).

[68] See *id.* See, also, *Employers' Liab. Assur. Corp. v. Madric*, 54 Del. 593, 183 A.2d 182 (1962) (recognizing distinction between confusion and misrepresentation).

information when he assured the Callahans that the policy limit was sufficient in amount, his express assurances could not have been in *patent* conflict with the express language of the policy.

Shelter and Brant also argue that the policy language forecloses all possibility that the Callahans could reasonably rely on Brant's alleged misrepresentations as a matter of law. They point to the provision that states it was the Callahans' "responsibility to examine the policy and make sure it provides the types of coverage you need in the amounts you requested." In essence, Shelter and Brant argue that this provision operated as a disclaimer. In my view, it does not.

Shelter and Brant overlook the preceding sentence in the policy: "If you have questions, contact your Shelter Agent for answers." The Callahans had a question, they contacted Brant for an answer, and Brant answered that their policy limit was in an amount sufficient to replace their home. It cannot be said that the Callahans were foolish to rely on Brant's answer as a matter of law.[69] The Callahans were not bound to assume that Brant was dishonest.[70] Brant was a licensed insurance producer who had been contracted with Shelter for over 15 years and had been active in the field of insurance since 2001. Both Michelle and Mark testified that Brant, equipped with his expertise, represented that their homeowners insurance policy limit was in an amount reasonably equal to the replacement cost value of their home. Whether their reliance on Brant's representations was reasonable is a question of fact based on the totality of the circumstances, which precludes the entry of summary judgment. Accordingly, in my

---

[69] See, *State Farm Fire & Cas. Ins. v. Lynn*, 516 So. 2d 1373 (Ala. 1987); *Harr v. Allstate Insurance Co.*, 54 N.J. 287, 255 A.2d 208 (1969); *Kelly v. S.C. Farm Bureau Mut. Ins. Co.*, 316 S.C. 319, 450 S.E.2d 59 (S.C. App. 1994); *Free v. Republic Ins. Co.*, 8 Cal. App. 4th 1726, 11 Cal. Rptr. 2d 296 (1992). See, also, *Anderson v. Knox*, 297 F.2d 702 (9th Cir. 1961) (applying Hawaii law).

[70] See *Fidelity Mutual Fire Ins. Co. v. Lowe, supra* note 55.

view, the district court erred in granting summary judgment on this claim.

Insofar as Brant contends for the first time on appeal that the Callahans had a duty to exercise ordinary prudence and that the Callahans' alleged failure to do so forecloses their ability to rely on his representations, we do not generally consider arguments and theories raised for the first time on appeal.[71] However, I note that in *Lucky 7 v. THT Realty*,[72] which Brant cites in support of his argument, we held that ordinary prudence is a factor in determining whether a plaintiff's reliance was reasonable, which is a question of fact based on the totality of the circumstances. That case lends no support that Brant is entitled to judgment as a matter of law.

## CONCLUSION

I disagree with the majority as to the applicability and effect of the valued policy statute on the Callahans' claims. I would conclude that Brant owed a duty of reasonable care to the Callahans with respect to both of their claims and that the Callahans were entitled to reasonably rely upon Brant's representations as to the sufficiency of their homeowners policy limit. Accordingly, I would reverse the district court's grant of summary judgment and remand the matter for further proceedings.

MILLER-LERMAN and FREUDENBERG, JJ., join in this dissent.

---

[71] See *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022).

[72] *Lucky 7 v. THT Realty*, 278 Neb. 997, 775 N.W.2d 671 (2009).