IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE ESTATE OF MAYBERRY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE ESTATE OF TERRY H. MAYBERRY, DECEASED.

ROBERT D. MAYBERRY, PERSONAL REPRESENTATIVE OF
THE ESTATE OF TERRY H. MAYBERRY, APPELLANT,

V.

MARY JO MAYBERRY, APPELLEE.

Filed January 2, 2024.    No. A-22-920.

Appeal from the County Court for Thurston County: DOUGLAS L. LUEBE, Judge. Affirmed.

Matthew M. Munderloh, of Johnson & Mock, P.C., L.L.O., for appellant.

Richard J. Thramer for appellee.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

ARTERBURN, Judge.

INTRODUCTION

Robert D. Mayberry appeals an order from the Thurston County Court regarding the administration of Terry H. Mayberry's estate. Robert and his brother, Vernon Mayberry, were named as Terry's heirs in his will. The will instructed that Terry's estate would be divided equally between the two brothers. Unfortunately, Vernon died shortly after Terry. Vernon's sole heir was his wife, Mary Josephine (Mary Jo) Mayberry.

In his role as personal representative of Terry's estate, Robert filed an application with the county court requesting that the court approve the execution and recording of several personal representative deeds (PR deeds) contemporaneous with the recording of one or two joint tenancy

- 1 -

warranty deeds. Mary Jo opposed the application and requested that the court enforce the terms of Terry's will instead. After a hearing, the county court denied Robert's application in its entirety.

On appeal, Robert asserts that the county court lacked subject matter jurisdiction to decide whether undue influence was exerted with respect to Vernon's execution of one or two joint tenancy warranty deeds, that Mary Jo did not sufficiently plead undue influence, that the joint tenancy warranty deed or deeds were not the product of undue influence, that Vernon entered into an enforceable agreement that altered the distribution of Terry's probate assets, and that Robert's application sufficiently put Mary Jo on notice of the issues to be tried. Upon our review, we affirm the county court's order to the extent that it declines to approve the PR deeds which would have distributed Terry's property in a manner different from the distribution as set out in Terry's will.

BACKGROUND

Terry died on January 6, 2021. Terry never married, and in his last will and testament, he named his mother, Earlene Mayberry, and his two brothers, Vernon and Robert, as his heirs. His will, dated December 10, 1990, provides: "I hereby give and devise unto [Earlene, Vernon, and Robert] all of my property of every nature and description of which I may die owning, in equal shares, share and share alike, issue to take by right of representation." Additionally, in his will, Terry nominates and appoints both Vernon and Robert to be the joint personal representatives of his estate. Earlene predeceased Terry, but Vernon and Robert survived him. However, Vernon died on January 24, 2021. Mary Jo, Vernon's wife, is his sole heir.

On January 27, 2021, Robert filed an application for informal probate of Terry's will and nominated himself as personal representative. He was subsequently appointed and qualified as personal representative of Terry's estate. On June 10, acting in his capacity as personal representative, Robert filed an application for an order "approving the execution and recording of the five (5) attached Personal Representative Deeds contemporaneous with the recording of the two (2) Vernon F. Mayberry and Mary Josephine Mayberry aka Mary Jo Mayberry Joint Tenancy Warranty Deeds." A total of seven deeds were attached to the application. However, contrary to what was pled, six of the deeds were PR deeds and only one was a joint tenancy warranty deed executed by Vernon and Mary Jo. The six PR deeds are conveyances from Robert, in his role as personal representative, to either Mary Jo or himself. One deed is dated January 29, 2021, but the date appears to be handwritten over an indeterminable printed date. The five other PR deeds are dated June 8, 2021. If approved, these conveyances would result in a distribution of Terry's real estate that varies from the 50/50 distribution to Vernon and Robert as provided in Terry's will.

The joint tenancy warranty deed, dated January 21, 2021, is a conveyance of property wholly owned by Vernon and is not included in Terry's estate. Instead, within this deed, Vernon and Mary Jo convey to Robert and his wife, Georgia, real property in Thurston County. In his application, Robert explains that on January 21, Vernon and Mary Jo conveyed two parcels of land to Robert and Georgia in consideration for the disproportionate distribution of real estate Vernon inherited from Terry's estate. As noted, Robert "requests that the Court enter an order approving the execution and recording of the [attached PR deeds] contemporaneous with the recording of the [joint tenancy warranty deed]."

On September 24, 2021, the county court granted Robert's application. In its order, it noted that Mary Jo did not file a resistance to the application and did not appear at the hearing. On

October 4, Mary Jo filed a motion for reconsideration, arguing that she did not receive notice of the hearing on Robert's application, that her counsel had previously expressed "severe objection" to any such application, that a prior hearing had been continued to allow the parties to have all involved real estate appraised, and that counsel for Mary Jo had not yet received the appraisal. Robert opposed the motion. On November 18, the county court issued a written opinion sustaining Mary Jo's motion to reconsider, finding that while there was intent to give notice, Mary Jo was not properly served notice of the continued date for hearing by the court and so any notice given was inadequate.

On January 27, 2022, the court held a hearing to reconsider Robert's application for approval of the deeds. An appraisal of the seven parcels of land at issue in this case was received by the court as an exhibit. Other than the appraiser, Georgia, Robert's wife, was the only person who testified on behalf of the personal representative. Georgia testified that these parcels were all owned by members of the Mayberry family. Earlene had owned some of this property, and when she died, Terry, Vernon, and Robert each inherited different parcels from her. The three brothers continued to farm the property after her death.

At some point following Earlene's death, Terry suffered a stroke and was placed in a nursing home. Georgia testified that both Vernon and Robert anticipated that Terry's death was imminent and, therefore, the family began discussing what would happen with Terry's property after Terry's death. She testified that she was present during those discussions and that both Terry and Vernon wanted the properties, specifically the parcels that made up what they deemed to be the "Odle farms," to stay in the family.

Georgia also testified that on January 21, 2021, while she and Robert were visiting Vernon in his home, Vernon again expressed a desire to convey the Odle farm to Robert to keep it in the family. At that time, Vernon and Mary Jo deeded the property to Robert and Georgia, as illustrated by their signatures on two joint tenancy warranty deeds. However, Georgia admitted that the notarization of the joint tenancy warranty deeds was faulty. The notary was not actually present in Vernon's home when he and Mary Jo signed the deeds. Georgia testified that due to COVID-19, she made special arrangements with the notary. After the deeds were signed, Georgia claimed that she took them and copies of Vernon and Mary Jo's driver's licenses to the notary's home where the deeds were notarized without Vernon or Mary Jo's presence. Georgia testified that both Vernon and Mary Jo were aware of this arrangement. Mary Jo, however, testified that she had never given anyone a picture of her driver's license. The notary, who was identified by Georgia as being a coworker of hers, did not testify.

Georgia also testified about the PR deeds attached to Robert's application and how those deeds differed from the deeds that were offered as exhibits during the hearing. Exhibits 5, 6, and 7 are PR deeds in which Robert, as personal representative of Terry's estate, conveys specific parcels to Vernon only. These deeds differ slightly from the deeds attached to Robert's application that concern the same parcels of land. The deeds in the application name Mary Jo instead of Vernon as grantee. Robert argues in his brief that this change was made after Vernon's death, since Mary Jo was Vernon's sole heir.

Exhibit 8 is a PR deed where Robert, as personal representative of Terry's estate, conveys one of the seven parcels to himself. This deed was attached to Robert's application. Georgia

testified that this property is part of the Odle farmstead and, therefore, is one of the parcels that Vernon wanted to keep in the family.

Exhibit 9 is a joint tenancy warranty deed in which Vernon and Mary Jo convey to Robert and Georgia a second parcel of land. This deed is referred to in the application but was not attached to Robert's application. It is clear from Georgia's testimony that the reason it was not attached was due to an error on the face of the deed. Counsel for Robert repeatedly suggested to Georgia in direct examination that the error was in the legal description of the property conveyed, but Georgia disagreed, stating that the property described should have gone to Vernon and Mary Jo, not Robert. She did not explain why it would be necessary for Vernon and Mary Jo to deed property to themselves.

Exhibit 9a is an unsigned PR deed that purports to convey a different tract of real estate from Mary Jo, as personal representative of Vernon's estate, to Robert and Georgia. This deed also was not attached to Robert's application. The deed explains that this conveyance aims to replace and correct exhibit 9, the faulty joint tenancy warranty deed that Vernon signed prior to his death. Georgia testified that this unsigned deed contained the correct legal description of property which exhibit 9 should have been conveyed to her and Robert by Vernon pursuant to their agreement.

Exhibit 9b is a PR deed in which Terry's estate conveys real property to Mary Jo. It appears that while this deed was not attached to Robert's application, a deed that concerned the same property was attached, but that deed conveyed the property to Robert, not Vernon or Mary Jo. Georgia testified that this parcel was part of the Odle farm, and as such, the exhibit 9b deed was erroneously drafted.

On cross-examination, Georgia admitted that she was aware of the condition of Mary Jo's health on January 21, 2021, specifically that Mary Jo had suffered several strokes in the past. Georgia testified she did not always believe Mary Jo to be a truthful person. Georgia also admitted that Vernon died 3 days after signing the joint tenancy warranty deeds. When asked if Vernon was on his deathbed, Georgia responded, "[m]aybe."

Georgia further testified on cross-examination that there was no written contract executed by Robert and Vernon or Robert and Mary Jo in her capacity as personal representative of Vernon's estate which memorialized the terms of the alleged agreement between Robert and Vernon. Rather, her contention is that the PR deeds along with the deeds signed by Vernon together set forth the terms of their agreement.

Mary Jo was 75 years old at the time she testified at the hearing. She testified that she had suffered at least five strokes in the past. While she had mostly recovered from them, she has lingering symptoms in one of her hands.

Mary Jo admitted to being present during the events of January 21, 2021, when Robert and Georgia came to her home with deeds prepared. She testified that they were not invited to the home and that Vernon was too sick to invite anyone over as he had not come out of the bedroom for a week. When they entered the home, Mary Jo observed Vernon walk from the bedroom to the kitchen, stating "that's about all the breath he had." She did not recall whether she saw Vernon sign any documents because she did not remain in the kitchen where he, Robert, and Georgia discussed the deeds. Once she exited, Mary Jo could not hear the content of their conversation. She testified that at some point, Vernon yelled at her to come back to the kitchen and sign the deeds. Without reading them, she signed as directed.

Mary Jo was unaware of any written agreements that Vernon entered into that would reflect the distribution of real estate as proposed by Robert in his application. Mary Jo testified that she did not agree to this distribution and wanted Terry and Vernon's estates to be distributed as set forth in their respective wills.

During closing arguments, Robert argued that the series of deeds attached to his application constituted a family agreement under Neb. Rev. Stat. § 30-24,110 (Reissue 2016), meaning that the agreement superseded Terry's will. Mary Jo countered that the deeds did not constitute a written agreement, as many of them were executed after Vernon's death and they were not all signed at the same time. The county court took the matter under advisement.

On March 17, 2022, the court entered an order denying Robert's application in its entirety. The court noted at the outset of its opinion that the evidentiary record in this case was confusing, as the deeds submitted as exhibits during the hearing differed from the deeds attached to Robert's application. The court found that when the joint tenancy warranty deeds were brought to Vernon, he was very ill and "literally on his death bed (just three days before his death)." The court also found that Mary Jo resisted signing these deeds but acquiesced when Vernon yelled at her to sign them. Moreover, the court noted that the notarization of these two deeds was done improperly because the notary was not present when Vernon and Mary Jo signed them. Ultimately, the county court found that Mary Jo proved by clear and convincing evidence that she and Vernon signed the joint tenancy warranty deeds under undue influence.

The court noted that while there was evidence that Vernon and Robert had engaged in discussions about land exchanges, the testimony was not persuasive that an agreement, oral or written, had been reached. Although Robert argued that the PR deeds he offered constituted one family agreement, the court disagreed. The court found that as the personal representative and beneficiary of Terry's estate, Robert was in a unique position to support Georgia's testimony or rebut Mary Jo's testimony. The fact that Robert, though present in the courtroom, did not testify weighed heavily against Robert's position that a family agreement existed. The court also noted that the deeds were signed at different times, some deeds remained unsigned, some deeds contained erroneous legal descriptions, and that some deeds misnamed grantors or grantees. The court concluded that Robert failed to prove a meeting of the minds regarding the alleged agreement, and Robert failed to prove timely receipt of consideration required by the alleged agreement.

On November 10, 2022, the county court entered a formal order for complete settlement after informal testate proceedings. The order states that Terry's will is valid and formally probated, and as such, Terry's estate was divided equally between Mary Jo, Vernon's sole heir, and Robert.

Robert appeals.

ASSIGNMENTS OF ERROR

Robert assigns that (1) the county court did not have subject matter jurisdiction to cancel the joint tenancy warranty deed attached to his application, (2) even if the court did have subject matter jurisdiction over the joint tenancy warranty deed, it erred in considering evidence of undue influence, as Mary Jo failed to sufficiently plead that claim, (3) even if the court had jurisdiction and Mary Jo had sufficiently pled undue influence, it erred in concluding that the joint tenancy warranty deed was a product of undue influence, (4) the court erred in concluding that Robert and

Vernon did not enter into an enforceable agreement governing the disposition of Terry's estate, and (5) the court erred in concluding that Robert's application did not sufficiently put Mary Jo on notice of the issues to be tried.

STANDARD OF REVIEW

Subject matter jurisdiction and statutory interpretation present questions of law. *In re Estate of Brinkman*, 308 Neb. 117, 953 N.W.2d 1 (2021). A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law. *Id.* An appellate court independently reviews questions of law decided by a lower court. *Id.*

In the absence of an equity question, an appellate court reviewing probate matters examines for error appearing on the record made in the county court. *In re Estate of Adelung*, 306 Neb. 646, 947 N.W.2d 269 (2020). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

ANALYSIS

*Subject Matter Jurisdiction.*

Robert first contends that the county court did not have subject matter jurisdiction to cancel the joint tenancy warranty deed Vernon and Mary Jo executed on January 21, 2021, that conveyed to Robert and Georgia property that was not part of Terry's estate.

Generally, a county court has exclusive original jurisdiction of all matters relating to decedents' estates, including the probate of wills and the construction thereof. Neb. Rev. Stat. § 24-517(1) (Cum. Supp. 2022). In exercising its original jurisdiction over estates, a county court may apply equitable principles to matters within probate jurisdiction. *In re Estate of Adelung, supra*. However, the Nebraska Supreme Court has ruled that when the property at issue was not the decedent's at the time of his or her death, the county court does not have jurisdiction over that property. See *Miller v. Janecek*, 210 Neb. 316, 314 N.W.2d 250 (1982). Thus, because the joint tenancy warranty deed attached to Robert's application concerned property that was Vernon's, not Terry's, we agree that at the time of Terry's death, the county court did not have jurisdiction to determine the validity of that deed.

However, after reviewing the court's March 17, 2022, order and judgment, we have been unable to identify any language suggesting that the county court actually cancelled the joint tenancy warranty deed. In his application, Robert alleges that the two deeds executed by Vernon and Mary Jo transferring Vernon's real estate to Robert and Georgia were part of an overall agreement between them which also included a distribution of Terry's real estate in a manner different than that provided in Terry's will. At trial, Robert presented evidence regarding the execution of the two deeds in support of his position that the agreement between Robert and Vernon existed as provided for in the terms of the seven deeds. This evidence was presented in order to get the court to enter an order approving the execution of the PR deeds and having them recorded contemporaneously with the recording of the two joint tenancy warranty deeds.

The court did as requested and reviewed the joint tenancy warranty deeds and the circumstances surrounding their execution. While the court found that Mary Jo proved the joint tenancy warranty deeds were the product of undue influence, this finding was made in the context

of its determination of whether an agreement existed between Robert and Vernon as alleged in Robert's application. In other words, the finding of undue influence was made only as a portion of the court's overall analysis as to whether to approve the PR deeds. In denying Robert's application, the court denies the request to approve the PR deeds, but nowhere in its order or conclusion does the court state that it was affirmatively cancelling one or both of the joint tenancy warranty deeds.

To be clear, we agree that the county court did not have jurisdiction to cancel the inter vivos transfer evidenced by the joint tenancy warranty deeds. However, it did have jurisdiction to assess the very issue raised by Robert in his application and at trial, that being whether the signing of the deeds supported his theory that a valid agreement existed between Robert and Vernon regarding the distribution of Terry's real property. Whether Vernon and Mary Jo acted freely and voluntarily in signing the deeds is relevant to the court's determination. Therefore, the court was free to make a determination of whether undue influence existed. That being said, the deeds themselves should be treated as neither approved nor cancelled by the county court. The court could not and did not make that determination.

Based on this holding, we also reject Robert's second assignment of error that Mary Jo did not sufficiently plead undue influence. The court was not asked to invalidate either of the joint tenancy warranty deeds, so no pleading was required. Mary Jo's evidence of undue influence was offered in response to Robert's assertion that the execution of the warranty deeds evidenced Vernon's intent to enter the agreement. We consider Robert's third assignment of error, whether undue influence existed, in conjunction with our analysis of whether an enforceable agreement existed between Robert and Vernon below.

*Enforceable Agreement.*

Robert also argues that the county court erred when it concluded that Vernon and Robert did not enter into an enforceable agreement regarding the distribution of Terry's probate assets that differed from the distribution as provided in Terry's will.

Where probate of a will is at issue in probate proceedings, devolution of the decedent's property devised by the will, subject to, among other things, the rights of creditors, is controlled by the Nebraska Probate Code. See, Neb. Rev. Stat. § 30-2201 (Cum. Supp. 2020); Neb. Rev. Stat. § 30-2401 (Reissue 2016). See, also, *In re Estate of Giventer*, 310 Neb. 39, 964 N.W.2d 234 (2021). The Nebraska Probate Code states that "competent successors may agree among themselves to alter the interests, shares, or amounts to which they are entitled under the will of the decedent . . . in any way that they provide in a written contract executed by all who are affected by its provisions." § 30-24,110. Robert asserts that the deeds, including the warranty deeds, taken and reviewed together, constitute a family agreement which satisfies the written contract requirement of the Nebraska Probate Code.

When construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *Callahan v. Brant*, 314 Neb. 219, 990 N.W.2d 1 (2023). In construing a statute, the court must look at the statutory objective to be accomplished, the problem to be remedied, or the purpose to be served, and then place on the statute a reasonable construction that best achieves the purpose of the statute, rather than a construction defeating the statutory purpose. *Id.*

Whether a collection of deeds can constitute a written contract under § 30-24,110 is unclear. The Supreme Court has recognized that deeds are contracts. *Aynes v. Bantz*, 114 Neb. 226, 206 N.W. 754 (1925). Further, in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction, are, in the eye of the law, one instrument, and will be read and construed together as if they were as much one in form as they are in substance. *Blum v. Poppenhagen*, 142 Neb. 5, 5 N.W.2d 99 (1942). We also recognize that while a collection of deeds does not fall within the plain or ordinary sense of the term "written contract," § 30-24,110 supports the rights of successors to alter their shares if they are in full agreement. However, Robert does not cite to any Nebraska case law, and we can find none, that speaks directly to his assertion.

The plain language of § 30-24,110 seems to contemplate that a single written agreement fully setting out the terms of the contract is required. But, assuming without deciding that a collection of deeds can satisfy the written contract requirement of § 30-24,110, such a finding does not end the analysis. The deeds in question must meet all the requirements of a written contract.

To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *Slama v. Slama*, 313 Neb. 836, 987 N.W.2d 257 (2023). Specifically, an enforceable contract requires a meeting of the minds as to the essential terms and conditions of the proposed contract. *Id.* It is a fundamental rule that in order to be binding, an agreement must be definite and certain as to the terms and requirements. *Barnett v. Happy Cab Co.*, 28 Neb. App. 438, 945 N.W.2d 200 (2020). It must identify the subject matter and spell out the essential commitments and agreements with respect thereto. *Id.*

After reviewing the record, we conclude that this collection of deeds does not satisfy the written contract requirement of § 30-24,110. At the outset, we note that in his brief, Robert attempts to supplement the record with specific terms of the alleged agreement that were not found elsewhere in the record. Our review is limited to the evidence that was provided to the county court, and as such, we will not consider any facts unsupported by the record.

Each deed attached to Robert's application and/or received during trial lists the grantors, the grantees, contains a brief description of the property at issue, and contains signatures from the grantors. However, none of the deeds reference any of the other deeds or a global agreement between Robert and Vernon to alter their shares of Terry's estate. The deeds could have listed in definite and certain terms the consideration (in the form of an exchange of tracts of real estate) that was agreed to in the alleged agreement, but they do not. The deeds do not spell out any essential commitments or agreements between Robert and Vernon. There is no description of what Robert must convey to Vernon or vice versa. The deeds do not tell us what parcels each brother agreed to convey, or how they are expected to convey those parcels.

Robert argues that the deeds themselves set forth the terms of Robert and Vernon's mutual understanding about the distribution of Terry's probate real estate. We disagree. If we read these deeds in the manner that Robert desires, the door would be open to personal representatives who are also beneficiaries to submit fraudulent collections of deeds at will in an attempt to achieve their own desired distributions of probate assets. Robert's recognition of this point is demonstrated by his decision to introduce evidence of the warranty deeds signed by Vernon and Mary Jo to meet

the signature requirement of § 30-24,110 and bolster his position that an enforceable agreement existed.

Moreover, the PR deeds attached to the application were not all executed on the same date. Robert argues that the deeds were all originally signed in January 2021 and that the June 2021 deeds were altered only to reflect that Mary Jo, not Vernon, was now the grantee. Regardless, the varied execution dates suggest that these deeds cannot be read together as a single, written contract.

Georgia also admitted that one of the warranty deeds was improperly drafted and, depending on what portion of her testimony is considered, either contained an inaccurate legal description or conveyed property to the wrong parties. Based on this testimony, Robert is essentially asking the court to approve of the deeds he claims accurately represent the alleged agreement, disregard the deeds he claims are faulty, and trust that his and Georgia's representations reflect the true terms of the alleged agreement. We decline to do so. The Nebraska Probate Code appears to require that the written contract set out clear, definite terms. If not clear, Terry's estate should be disposed of according to the terms in his will. See § 30-2201.

In conclusion, while there is evidence that Robert and Vernon discussed property distribution, there is no evidence that Robert and Vernon had a meeting of the minds or a binding mutual understanding to alter their shares of Terry's estate. The county court described the January 21, 2021, encounter between Robert and Vernon as a classic example of undue influence given that Vernon was essentially on his deathbed at the time Robert presented the deeds to him. Regarding Mary Jo, the court found that she only signed the deeds after being yelled at by her husband to do so. We find that competent evidence existed in the record to support the court's reasoning. Finally, we note that one of the deeds signed by Vernon and Mary Jo was inaccurate, as admitted by Georgia. This supports the county court's conclusion that Vernon and Mary Jo did not make a free and voluntary choice to thoughtfully review the documents they signed. We pause to note that since we address the undue influence issue in the context of whether an overall agreement existed as opposed to an equitable action attacking the validity of the warranty deed, our review is not de novo, but for error appearing on the record. See *Mock v. Neumeister*, 296 Neb. 376, 892 N.W.2d 569 (2017).

Although our reasoning differs to some degree from that of the county court, we reach the same result, i.e., that Robert's collection of deeds does not constitute a written agreement under § 30-24,110. See *Lindsay v. Fitl*, 293 Neb. 677, 879 N.W.2d 385 (2016) (where record demonstrates that decision of trial court is ultimately correct, although such correctness is based on ground or reason different from that assigned by trial court, appellate court will affirm).

*Robert's Application.*

In Robert's final assignment of error, he argues that the county court erred when it concluded that Robert's application did not sufficiently put Mary Jo on notice of the issues to be tried. The court stated:

> From the morass that is the evidentiary record, what is clear is that the various deeds attached to the Application were not identical to those offered during the hearing. Thus, as part of the Application they did not comport to the rule "pleadings (are) to frame the issues upon which a cause is to be tried *and advise the adversary as to what he must meet*.["]

(Emphasis in original.) Robert admits that the court was correct that several of the deeds attached to his application varied from the deeds received at the hearing. However, Robert asserts that despite these variations, his application was not deficient. He also argues that at the hearing, Mary Jo never objected to or protested his application for failing to put her on notice of the issues being tried.

We agree with Robert that his application put Mary Jo on notice of the issues to be tried at the hearing. Although some changes to the signed deeds were made, these changes were mostly minor. Vernon's name was removed as grantee and replaced with Mary Jo's name following Vernon's death. In addition, having responded to and opposed Robert's application, she was also aware of the overarching issue in this case: whether Terry's will or the PR deeds controlled the distribution of Terry's estate.

Robert contends that the county court based its order and judgment in part on this improper notice finding, and because that finding is erroneous, the court's order and judgment must be reversed. We disagree. The court based its order and judgment on a multitude of factors, including the various execution dates of the PR deeds, the uncertain set of terms within the various instruments, erroneous legal descriptions, the possible misnaming of grantors or grantees, undue influence applied to Vernon and Mary Jo by Robert and Georgia, and the overall sufficiency of the evidence given Robert's failure to testify though present at the hearing. As detailed above, we find that the portion of the order denying Robert's application as it relates to the six PR deeds is sound, albeit for slightly different reasons. Therefore, while the county court erred in concluding that Robert's application did not adequately notify Mary Jo of the issues to be tried, this factor is not of such importance or weight that a reversal of the court's judgment is supported. The remaining factors cited are sufficient to support the county court's decision. We, therefore, affirm the county court's decision to deny approval of the PR deeds and require that the real estate owned by Terry be distributed in accordance with his will.

## CONCLUSION

After careful consideration of the record, we affirm the county court's order denying approval of the PR deeds.

AFFIRMED.